**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **IN RE:   UNITED HOME HEALTH CARE,** | ) | |
| **INC.** | ) | |
| | ) | **CASE NO.  05-72094** |
| **Debtor** | ) | |
| | ) | **CHAPTER 11** |
| | ) | |

**APPLICATION FOR ADMINISTRATIVE EXPENSE**
**FILED BY FAIRLAWN ENTERPRISES, L.L.C.**

**<u>MEMORANDUM DECISION</u>**

The surprisingly challenging matter before the Court is the Application of

Fairlawn Enterprises, L.L.C. ("Fairlawn") for allowance of an administrative expense in this case

of certain amounts for "holdover" rent and alleged damages associated with the occupancy and

vacating by the Debtor ("United") of certain premises formerly occupied by United and

purchased by Fairlawn in September of 2005.  These premises had been formerly owned by an

affiliate of the Debtor and had been conveyed by it to Valley Bank in full satisfaction of the

affiliate's debt to such bank, which then sold it to Fairlawn.  At the hearing upon the

Application, Fairlawn's claim was reduced to three components: (i) "holdover" rent for the

period from October 21, 2005, the date United was obliged to surrender the premises to

Fairlawn, thru November 6, 2005, the date such surrender actually occurred; (ii) alleged damages

to the premises associated with the removal of a burglar alarm system from the premises by the

Debtor's contractor; and (iii) the value of a counter removed from the premises which United

claims was a fixture and had become part of the building.  For the reasons set out below, the

Court will partially grant and partially deny such Application.

1

FINDINGS OF FACT

United and Wilson Palmer Properties, L.L.C. ("WPP")  were affiliated companies

in that they were commonly controlled by Elizabeth Wilson Palmer.  United had been formed

and owned by Ms. Palmer's parents, Mr. and Mrs. Wilson, and she inherited sole ownership of

same from them.  United was an operating company and WPP was apparently a limited liability

holding company organized for the purpose of constructing and owning certain business

premises occupied by United under a lease arrangement with WPP.  The evidence does not

establish whether WPP was also solely owned by Ms. Palmer or whether anyone else, such as

her husband, had any ownership interest in it.  The construction of these premises was financed

for WPP by Valley Bank.  When United got in financial difficulty and could not pay its bills, this

of course adversely impacted WPP, which ended up deeding the property to Valley Bank in lieu

of foreclosure and in full satisfaction of its debt to the bank.  At that time United was continuing

to use these premises as a debtor-in-possession in the present Chapter 11 bankruptcy case.

Fairlawn and United agreed that the latter would continue to use the premises from October 1

thru October 15, 2005 at a rental equivalent to $3,750[1] per month.  The parties further agreed

that thereafter any continued occupancy after October 15 by United would be on a week-to-week

basis at the same rental.  As it turned out Fairlawn decided that it wanted United out fairly

quickly and gave notice to vacate the premises by October 21, 2005.  This was actually the day

before United's occupancy was due to end under the week-to-week arrangement agreed to by the

---

[1] The Stipulation states a figure of $3,500 per month, but counsel for the Debtor
acknowledged that the correct figure is $3,750 and that seems to be confirmed by other evidence
in the case, including the Debtor's Disclosure Statement filed in this case with its Plan of
Reorganization.

parties.  In any event, United did not vacate the premises until November 6.  During this period

of "holding over" Fairlawn seeks to recover rent based on a rental rate of $449.36 per day,

determined by utilizing a $11,587.50 per month rent figure contained in a lease which it entered

into with another company, plus estimated expenses of electricity, water and real estate taxes,

divided by 365 days in a year.  Under this new lease agreement Fairlawn was to modify the

premises substantially and rent would not begin to be due until the earlier of when the tenant

began treating patients or 120 days after all building permits necessary to commence work were

received.  Mr. Robert Jarrett, Fairlawn's managing member, testified at the hearing that he did

not apprise United of the new lease or its terms.  The amount sought by Fairlawn for "holdover

rent" is $6,028.80, which amount is calculated as follows: $449.36 x 16 days less credit of

$1,160.96 for balance of October rent paid in advance at rate of $3,500.  United takes the

position that it paid rent for the entire month of October and that it is only liable for rent for six

days in November at the rate of $125 per day, or a total of $750.  The Court finds that United

incurred liability for rent for its occupancy after October 15 as follows:  October 16 - 31: $2,000

(16 days at $125 per day), November 1 - 6: $750 (6 days at $125 per day).  The sum of these

amounts is $2,750.  Mr. Jarrett acknowledged during cross-examination that the Debtor had paid

rent for the entire month of October in the amount of $3,750.  One-half of this amount, or

$1,875, would be applicable to the period October 16 thru October 31.  Giving credit for this

amount already paid by United against the rent liability of $2,750 results in a remaining balance

due of $875.

Fairlawn next seeks $750.00 for damages alleged to have been done to one of the

entrance doors supposedly occasioned by the removal of a burglar alarm system leased by

United at the time it vacated the premises ($700) and for damage to the wall resulting from the

removal of the alarm system keypad ($50).  Mr. Worth Boone, on behalf of Fairlawn's

remodeling contractor, testified about the damage to the wall and the damage to the door, which

he specifically and unequivocally attributed to the removal of alarm "sensors" from the door

"pivot".  Mr. Phillip Bane, who testified on behalf of the Debtor, denied that any damage had

been done to the door in question or that any sensors had been removed or that there would have

been any reason to remove the old sensors as new ones were installed in the new premises to

which the Debtor moved after vacating the premises acquired by Fairlawn.  The evidence on this

point was considerably less definitive than the Court would have preferred.  For example, the

testimony did not disclose exactly when it was that Mr. Boone found the door in question to be

damaged.  Although Mr. Bane testified that he believed the doors to the building were in

operating condition at the time United left the premises, it was never clear to the Court's

satisfaction that he actually made any inspection of the specific door referenced in Mr. Boone's

testimony.  Neither did the Debtor call as a witness any individual who had actually been

involved in the removal of the alarm system to testify about exactly what was done in that

process.  On a standard of "clear and convincing" evidence, the Court would have to find against

Fairlawn.  Based on a preponderance of the evidence standard, however, the Court finds the

testimony of Mr. Boone to be somewhat more impressive and persuasive than that of Mr. Bane.

The Court doesn't doubt that both of them believed what they testified to, but Mr. Boone's

experience as a building contractor and his relative independence from the actual contesting

parties together with his demeanor on the stand swung the pendulum of evidence slightly in

Fairlawn's favor.  Based on that testimony, the Court finds that total damage to the building in

4

the amount of $750.00 resulted from the removal of the burglar alarm system.

The third component of Fairlawn's claim, and the one which the Court has had the greatest difficulty in resolving, concerns the removal of a counter which rested on a tile floor from the premises when United vacated on November 6.  This counter was identical to another counter which rested on carpet and which the Debtor also took with it when it left.  This latter counter was not attached in any manner to the floor and Fairlawn by the time of the hearing acknowledged that it had no claim to that one.  The counter situated on the tile, however, was rather minimally affixed to the building by caulking around the base of the counter which created a bond with the tile floor underneath.  The evidence, including pictures of the location on the tile floor where this counter had been located, establishes that there is no grout between the tiles under this counter's "footprint" although all of the remainder of the tile floor is properly grouted.  The parties have stipulated that this counter was installed as follows:

a.      12" by 12" tile had been laid on the concrete floor, but had not been grouted, at the time of the installation of the Counter;
b.      The counter was placed on top of the ungrouted tile;
c.      The tile was grouted around the Counter, but not underneath its edges; and
d.      Caulk was placed around the perimeter of the Counter.

Debtor's Exhibit 1, the construction agreement for the business premises submitted by Commonwealth Builders, Inc. to "Beth Wilson", included "cabinets per plans excluding retail area sales counter" and expressly excluded "cabinetry for retail area".   Mr. Bane, who purchased United during the course of this Chapter 11 case from Ms. Palmer and had no affiliation with United at the time the building was constructed, testified that United had no intention to make this counter a fixture to the building.  He explained that the counter was caulked to the tile floor to prevent moisture during floor cleaning from getting under the counter

and making it susceptible to damage.  Mr. Jarrett, who testified on behalf of Fairlawn, testified

that based on his inspection of the property before its purchase, he believed the counters were a

part of the building rather than separate personal property of the Debtor.  Mr. Bane on behalf of

the Debtor of course disputed any such assumption as being reasonable or justified.  In response

to a question from the Court, he testified that he was pretty sure that both of the cabinets were

listed on the Debtor's depreciation schedules and had been included in the Debtor's asset

schedules, but wasn't certain of this fact.  The Court has examined Schedule B filed in this case

and has noted that it contains an entry for "furniture, fixtures and equipment" at its business

location having an indicated value of $25,000, but without any itemization of such amount.  The

Debtor did not call Ms. Palmer as a witness to testify about her intention as a principal of both

the building owner and the tenant concerning this counter at the time of its installation in the

building or offer any reason why she could not have been called.  Mr. Boone testified that the

cost of obtaining a similar cabinet to the one removed by the Debtor was $9,979.20, although

Fairlawn only requested $9,600 in the Application.  Fairlawn did not offer any other evidence as

to the value of the counter or how much the value of the building was reduced by its removal,

either by the testimony of Mr. Jarrett as the managing member of Fairlawn and owner of the

property, or by any real estate appraiser.  Mr. Bane testified that the cabinet in question was a

"stock" cabinet from a supplier and had not been specially designed or constructed for use in

this particular building as contrasted with any other building in which the Debtor might conduct

its business.  He further testified that the counters had been removed to the Debtor's new place

of business and were equally suited for use there as the former location.  This testimony was not

disputed by any testimony offered on behalf of Fairlawn.

As to this issue as well the evidence offered by the parties proved less than satisfactory to the Court.  The evidence offered on Fairlawn's behalf was not clear that it was going to spend the amount testified by Mr. Boone to replace the counter or that the diminution in value of the building from the removal of the counter was equal to the cost of obtaining a new one of similar size and quality.  Mr. Boone did testify that the plan was that the counter was to be used as a nurse's station for the new tenant.  The Debtor failed to offer in evidence any depreciation schedules documenting its ownership of the counters in its regular books and records and failed to offer in evidence the testimony of Ms. Palmer, who would appear to have been in a position to offer the "best evidence" concerning why the counter was installed on ungrouted tile rather than waiting until after this process had been completed before doing so. The Court is left simply to speculate as to why this occurred.  It is not able to give any meaningful weight to Mr. Bane's testimony about the Debtor's intention in view of his own self-interest and lack of involvement when the critical events occurred.  Based on the evidence presented to the Court, it finds that the counter in question was not specially made for use in the particular premises constructed for United's use by WPP but for use in the Debtor's business operations wherever they might be conducted.  It further finds that the counter placed on the tile floor was affixed to that floor by the use of caulk and that the most reasonable inference arising from the fact that it was installed on top of ungrouted tile is an intention at the time of its installation that it would remain in that specific location for the indefinite future, if not permanently.

CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28

U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

Court on July 24, 1984.  The determination of claims made against a bankruptcy estate is a

"core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(B).

Statutory authority for the allowance of an administrative expense for post-

petition rent for the Debtor's use of Fairlawn's property is provided by 11 U.S.C. §

503(b)(1)(A), which deals with the "actual, necessary costs and expenses of preserving the

estate."  Fairlawn bears the burden of proof to establish its entitlement to an administrative

expense claim against the estate and the proper amount thereof.  *In re Merry -Go-Round*

*Enterprises, Inc.,* 180 F.3d 149, 157 (4th Cir. 1999).  *See generally* Barry Russell, *Bankruptcy*

*Evidence Manual* § 301.53, at 858-59 (2006 ed.).

> A prima facie case under § 503(b)(1) may be established by evidence
> that (1) the claim arises from a transaction with the debtor-in-
> possession; and (2) the goods or services supplied enhanced the
> ability of the debtor-in-possession's business to function as a going
> concern.  After the movant has established a prima facie case, the
> burden of producing evidence shifts to the objector; but the burden
> of persuasion, by a preponderance of the evidence, remains with the
> movant. . . . Mere allegations, unsupported by evidence, are
> insufficient to rebut the movant's prima facie case."

*Matter of TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).

The Court concludes that the "holdover" rent sought by Fairlawn should be

denied, except to the extent of $875 determined in the Findings of Fact portion of this Decision,

for the following reasons:

1.  Proof of a new lease with a new tenant providing for rent to be paid in the

future after significant remodeling expense had been incurred by the building owner is not

satisfactory evidence of the fair market rental value of the premises during the "holdover" period

and no other evidence of such rental value of the premises in the existing condition in late

October and early November of 2005 was introduced.

2.  In the absence of such evidence, the rental rate of $3,750 per month agreed to

by the parties at the end of September, 2005 is the best evidence of such value.

3.  Fairlawn did not give United any notice concerning the damages it might

reasonably incur if the latter failed to vacate the premises when notified to do so.  Accordingly,

United had no reason to realize that the liability it might incur from breach of its contractual

obligation to vacate the premises would be measured by anything other than the rent applicable

during the period immediately preceding the date it was obliged to vacate such premises.

Furthermore, the parties did not make any agreement concerning the rent which would be due if

United failed to vacate the property when expected.  The Court concludes that Va. Code § 55-

223, which makes a "holdover" tenant responsible to the property owner not only for

compensation for use and occupation of the premises, but also "any loss or damage sustained by

the lessor because of such failure to surrender possession at the time stipulated", is properly

interpreted, in the absence of any definitive Virginia case authority on point, to apply to any loss

or damage reasonably within the expectations of both parties on the basis of information

possessed by them both, not to "lost opportunity" of which the tenant has not been placed on

notice.  Such an interpretation is in keeping with the basic principle of contract law limiting

recoverable damages resulting from a breach of contract to those within the reasonable

expectation of the parties at the time of entering into the contract.  *Fairfax County*

*Redevelopment & Housing Auth. v. Hurst & Assocs. Consulting Eng'rs, Inc.*, 343 S.E.2d 294, 296 (Va. 1986); *Morris v. Mosby*, 317 S.E.2d 493, 497 (Va. 1984); 5C *Michie's Jurisprudence* 51, Damages § 13 (1998 Repl. Vol.).  For these reasons, the Court concludes that $875 should be allowed to Fairlawn for the unpaid balance of rent during the "holdover" period which ended November 6, 2005.

As to the second component of Fairlawn's claim concerning the alleged damage to the building resulting from the removal of the burglar alarm system, the Court has found that $750 worth of damage resulted from such removal.  The Court concludes that the Debtor has the same liability in bankruptcy to an aggrieved party for post-petition transactions as it would have to that same party outside of a bankruptcy proceeding.  Accordingly, any such damage resulting from the Debtor's use and occupancy of the premises as a debtor-in-possession is a proper administrative claim against the bankruptcy estate.  *See generally Reading Co. v. Brown*, 391 U.S. 471 (1968)(allowing administrative claim for tort claims of adjoining property owners resulting from fire negligently caused by debtor-in-possession).  Therefore, the Court concludes that this amount should be allowed as an administrative expense of the estate.

The legal test for determining whether any particular item of personal property has become an improvement to some parcel of realty as to become a fixture has been examined in decisions of the Bankruptcy Court for the Eastern District of Virginia in the cases of *In re Concrete Structures*, 9 B.R. 72 (Bankr. E.D. Va. 1981); *In re Shelton*, 35 B.R. 505 (Bankr. E.D. Va. 1983); and *In re Alterman*, 127 B.R. 356 (Bankr. E.D. Va. 1991).  These opinions all cite the opinion of the Supreme Court of Virginia in the case of *Danville Holding Corp. v. Clement*, 16 S.E.2d 345 (Va. 1941), which states the governing legal principles to be as follows:

10

> In the absence of any specific agreement between the parties as to the character of a chattel placed on the freehold, the three general tests are as follows: (1) Annexation of the chattel to the realty, actual or constructive; (2) its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) the intention of the owner of the chattel to make it a permanent addition to the freehold.
>
> While, under the first test, there must be actual or constructive annexation, the method or extent of the annexation carries little weight, except insofar as they relate to the nature of the article, the use to which it is applied and other attending circumstances as indicating the intention of the party making the annexation.
>
> The second test – adaptation of the chattel to the use of the property to which is annexed – is entitled to great weight, especially in connection with the element of intention. If the chattel is essential to the purposes for which the building is used or occupied, it will be considered a fixture, although its connection with the realty is such that it may be severed without injury to either.
>
> The intention of the party making the annexation is the paramount and controlling consideration. The test of intention is given a broad signification. It does not imply a secret, undisclosed action of the mind of the owner of the property. The intention need not be expressed in words; it may be inferred from the nature of the article affixed, the purpose for which it was affixed, the relationship of the party making the annexation and the structure and mode of annexation.

*Id.* at 349.

Fairlawn's counsel directs the Court's attention to the principle that when an owner affixes some chattel to his own real property, it is presumed that he does so with the intention of making it a fixture. *See generally Alterman*, 127 B.R. 356; *Shelton*, 35 B.R. 505; *Danville Holding Corp.*, 16 S.E.2d at 349. Fairlawn has not disputed United's assertion that it, rather than WPP, the building owner, purchased the counter and put it in the building. The *Concrete Structures* decision, however, held that the rule establishing a presumption in favor of

11

finding an intent to annex a structure to the land to which it is affixed when done by an owner of

the property is not applicable when such attachment occurs as a result of the actions of a third

party.  *See Concrete Structures*, 9 B.R. at 74.

> [W]hen a landowner consents to the placing of a building on his land
> by another, without an express agreement as to whether it shall
> become a part of the realty or remain the property of the person
> placing it there, in the absence of any other facts and circumstances
> tending to show a different intention, an agreement will be implied
> that the building is to remain the property of the one placing it there.

*Id.* (citing and quoting from *State v. Ancient Order of United Workmen,* 283 P.2d 461, 468 (Kan.

1955)).  *Accord* 35 Am. Jur. 2d 763, Fixtures § 80 (1967).  In this case the evidence establishes a

close connection between United, WPP and Elizabeth Wilson Palmer, but it does not establish an

identity of economic interest among them.  In the absence of direct evidence which is

satisfactory to the Court concerning  Ms. Palmer's intention when the counter in dispute was

seated on the ungrouted tile of WPP's building, the Court is left to determine whether a

presumption of intent to annex or conversely an intent not to annex is applicable.  In the absence

of evidence that Ms. Palmer was the sole owner of WPP as well as United or that such entities

were treated as one and the same without recognition of their separate legal status, the Court

concludes that it ought to employ the presumption that United did not affix the counter to the tile

floor with the intent of making it a permanent improvement and fixture to the real property

owned by its affiliate, WPP.  Such a conclusion seems consistent with the continued status of the

second counter which was located on carpet rather than tile as United's personal property as it

would seem odd to determine that there was an intent to make one but not both counters fixtures

to the building.  Further, it recognizes that the burden of proof to establish an administrative

expense rests upon the claimant, rather than it being the trustee's or debtor-in-possession's

burden to prove the contrary.  Accordingly, any deficiency in the evidence must weigh against

the granting of the Application.

CONCLUSION

For the reasons noted above, the Court will allow an administrative expense claim

to Fairlawn Enterprises, L.L.C. in the amount of $1,625.00 and will deny the balance of its

Application.  An order to such effect will be entered contemporaneously with the signing of this

Decision.

This 18th day of April, 2006.

William F. Stone, Jr.

UNITED STATES BANKRUPTCY JUDGE